IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HEDWIG A. MARCH, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-2093-G (BH) |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, § 636(b)(1)(B), and the District Court's implementation of Special Order No. 3-251, this matter has been referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff, Hedwig March's, Motion and Incorporated Brief in Support of Summary Judgment* ("Mot."), filed April 10, 2007; *Commissioner's Motion for Summary Judgment* ("Resp."), filed May 21, 2007; and *Plaintiff's Reply to Defendant's Brief* ("Reply"), filed July 3, 2007. Having reviewed the evidence of the parties in connection with the filings, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED**, Commissioner's motion for summary judgment be **DENIED**, and the case be remanded for further proceedings.

**I. BACKGROUND**[1]

**A.  Procedural History**

Hedwig A. March ("Plaintiff") seeks judicial review of a final decision by the Commissioner

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

of Social Security ("Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act. On June 15, 2004, Plaintiff filed an application for disability benefits. (Tr. at 64-66). Plaintiff claimed she has been disabled since December 23, 2003, due to (1) herniated disks, (2) arthritis, and (3) degeneration in the spine. (Tr. at 64, 78). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 25, 33). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 37). A hearing, at which Plaintiff personally appeared and testified, was held on November 2, 2005. (Tr. at 591-639). On April 24, 2006, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 12-21). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 5-7). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 5). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on November 13, 2006.

**B.     Factual History**

     **1.     Age, Education, and Work Experience**

Plaintiff was born on February 22, 1946. (Tr. at 64). At the time of the hearing before the ALJ, she was 59 years old. (Tr. at 595). She graduated from high school. *Id*. Her past relevant work experience included work as a traveling sales representative. (Tr. at 79). Plaintiff last worked on December 23, 2003. (Tr. at 64, 595-96).

     **2.     Medical Evidence**

Plaintiff presents a voluminous medical history, much of which falls outside the period relevant to her claim for disability insurance benefits. The Court focuses on Plaintiff's medical

records from her alleged onset date of disability through the date of the ALJ's decision denying disability benefits.

On December 23, 2003, Dr. David Waters, M.D., performed spinal surgery on Plaintiff. (Tr. at 232). Specifically, Dr. Waters decompressed Plaintiff's L2-L3, L3-L4, L4-L5, and L5-S1 vertebral segments and performed total laminectomies and foraminotomies over the respective roots.[2] Dr. Waters then inserted screws at the L3, L4, L5, and S1 levels and interconnecting rods. (Tr. at 231).

Over the next four and a half months, Plaintiff visited Dr. Waters on four occasions for follow-up examinations. On February 2, 2004, Dr. Waters noted that Plaintiff was doing "very well," although she experienced residual L4 numbness and pain with weakness in the quadriceps and in the left leg. (Tr. at 264). On March 1, 2004, Plaintiff continued to complain of residual sensory loss involving the L4 nerve root, but, overall, Dr. Waters opined she was "progressing nicely." (Tr. 266). Three months after surgery, on April 5, 2004, Plaintiff complained of poor endurance, ease of fatigue and soreness in her back. (Tr. 265). Dr. Waters noted that Plaintiff had good strength and sensation in both legs, and encouraged Plaintiff to walk more. On Plaintiff's last post-operative visit with Dr. Walters on May 5, 2004, he reported that she was "doing well," and that the discomfort in her legs and hips had "improved." (Tr. 267).

Concurrent with her care from Dr. Waters, Plaintiff also visited Dr. Lisa Barr, M.D., on March 25, 2004, for evaluation of chronic right-sided back, shoulder, and arm pain. (Tr. at 351). Plaintiff explained that her symptoms worsened when she carried luggage on her right arm or

---

[2]A laminectomy is the surgical removal of the posterior arch of a vertebra. A foraminotomy is a surgical procedure performed to enlarge the passageway where a spinal nerve root exits the spinal canal. Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited May 6, 2008).

shoulder and with the use of a regular telephone. *Id*. Dr. Barr noted that she lacked radiology reports for Plaintiff's neck. On examination, most of Plaintiff's objective signs were normal. However, her deep tendon reflexes were 1+ in her upper and lower extremities. (Tr. at 352). In addition, on palpitation, Plaintiff had extensive muscle tension with active trigger points in several of the muscles in her upper back and neck. Based upon this examination, Dr. Barr opined that Plaintiff had chronic cervicalgia, myofascial pain syndrome with muscle spasms, a history of carpal tunnel surgery (left), diabetes mellitus, and hypertension.[3] (Tr. at 353). Dr. Barr performed a trigger point injection and suggested myofascial therapy one or twice a week. Dr. Barr also recommended that Plaintiff alter her ergonomics, obtain a pull-type luggage carrier with wheels, and use a hands-free headset for telephone calls. *Id*.

In April and May of 2004, Plaintiff participated in physical therapy under the direction of physical therapist ("PT") Kathryn Bragg. At the first session on April 21, 2003, PT Bragg observed that Plaintiff could ambulate independently with a slowed gait pattern and that she exhibited obvious discomfort due to the back brace she wore as a result of her December 2003 surgery. (Tr. at 383). PT Bragg also noted Plaintiff stood with increased shoulder elevation on the right and increased shoulder retraction and scapular adduction. Plaintiff's cervical ranges of motion were moderately restricted through all planes with increased discomfort at the cervical lateral flexion and with rotation to the left. PT Bragg also noted moderate to marked soft tissue restrictions in her upper torso, upper back, and neck. After several physical therapy sessions, PT Bragg reported on May 5, 2004, that Plaintiff was no longer required to wear her back brace. (Tr. 380). Without the brace, Plaintiff reported that her back fatigued fairly quickly but her upper back was doing much better.

---

[3]Cervicalgia is a type of neck pain. Myofascial refers to sheets of muscle. Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited May 6, 2008).

PT Bragg reported that Plaintiff was progressing well with physical therapy and had reduced upper quadrant restrictions; however, PT Bragg also noted more localized restriction into Plaintiff's deeper cervical and upper thoracic paraspinals along with the scalenes. PT Bragg remarked that Plaintiff would benefit from continued physical therapy.

As part of Plaintiff's disability application, a state agency medical consultant (SAMC) reviewed her medical record and completed a physical residual functional capacity (RFC) assessment in July of 2004. (Tr. at 282-289). The SAMC found that Plaintiff had the following exertional limitations: she could occasionally lift or carry (or both) 50 pounds; frequently lift or carry (or both) 25 pounds; stand, walk, or both for 6 hours in an 8-hour workday; sit for 6 hours in an 8 hour workday; and had an unlimited ability to push or pull (or both). (Tr. at 283). The SAMC also found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 284). Finally, the SAMC noted that Plaintiff's alleged limitations were supported by the medical record but that they were not expected to last 12 months. (Tr. at 287). A different SAMC affirmed this opinion in September of 2004. (Tr. at 289).

After moving from Virginia to Texas, Plaintiff visited Dr. Hank Miller, a chiropractor, for pain in the right side of her neck. (Tr. at 298-304). On July 29, 2004, Dr. Miller noted muscle spasms in the cervical and lumbar spine, as well as swelling, tenderness, and a decreased range of motion in the lumbar spine. (Tr. at 298-99).

A few days later, on August 2, 2004, Plaintiff visited Dr. Kenneth Licker, M.D., a urologist for a complaint of blood in the urine. (Tr. at 426-29). Upon diagnosis, Dr. Licker stated that blood was present in the urine but that Plaintiff did not have a urinary tract infection. (Tr. at 428). He also noted that Plaintiff did not demonstrate stress incontinence at the time but that she described a history of stress incontinence. *Id*.

On August 24, 2004, Dr. Bob Felty, M.D., examined Plaintiff for complaints of low back pain which radiated into her left leg. (Tr. at 280). Dr. Felty noted tenderness to palpation in Plaintiff's lumbosacral spine and a decreased range of motion. The following week, on August 31, 2004, Dr. Christopher Garrison, M.D., examined Plaintiff for her chronic low back pain. (Tr. at 281). Dr. Garrison noted that Plaintiff had questions concerning her disability application. On examination, Dr. Garrison observed that Plaintiff had 5/5 strength in her lower limbs with normal and symmetric reflexes. He also observed that her "ROM [range of motion] of the lumbrosacral spine is decreased secondary to pain and that which would be consistent with a fusion" and that internal rotation of the hip produced "significant symptoms in the low back and buttock region." Dr. Garrison's impression was that Plaintiff had "findings consistent with symptomatic degenerative disc disease s/p fusion." (Tr. at 281).

Dr. Shaad Bidiwala, M.D., examined Plaintiff on September 8, 2004, on a referral from Dr. Felty for Plaintiff's complaints of left lower extremity weakness and pain. (Tr. at 576-77). Dr. Bidiwala noted that Plaintiff denied any bowel or bladder incontinence. (Tr. at 576). After an unremarkable examination, Dr. Bidiwala found no evidence of a pedicular fracture or neural foraminal compromise from the pedicle screws. (Tr. at 577). He prescribed Neurontin for the pain and ordered a series of MRIs, which were performed on September 17, 2004. (Tr. at 571-75, 577). The MRI of Plaintiff's cervical spine, performed by Dr. Wendy Wong, M.D., and Dr. Steven Gilbert, M.D., showed moderate right uncovertebral joint hypertrophy at the C3-C4 and C6-C7 levels contributing to mild to moderate foraminal stenosis but no central canal stenosis.[4] (Tr. at

---

[4] Hypertrophy is the excessive development of an organ or part, specifically an increase in bulk (as by thickening of muscle fibers) without multiplication of parts. Stenosis is a narrowing or constriction of the diameter of a bodily passage or orifice. Medical Dictionary, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited May 6, 2008).

572). The MRI of Plaintiff's lumbar spine showed no residual central canal stenosis. (Tr. at 574). Drs. Wong and Gilbert noted that evaluation of the lumbar spine MRI was difficult due to the metal rods inserted in December of 2003. *Id*. At a follow-up visit on September 29, 2004, Dr. Bidiwala wrote that Plaintiff's pain, numbness, and weakness had stabilized. (Tr. at 569). In contrast to the findings by Drs. Wong and Gilbert, Dr. Bidiwala determined that the cervical spine MRI was unremarkable and that the lumbar spine MRI was remarkable only for the L3 to S1 fusion Plaintiff had in December of 2003. *Id*. Dr. Bidiwala determined that Plaintiff's lower extremity weakness, pain, and numbness were improving since surgery and that the MRIs showed no obvious nerve root impingements to explain Plaintiff's symptoms. *Id*.

In September of 2005, Plaintiff visited Dr. Brad Colllins, a chiropractor, on several occasions for complaints related to (1) muscle spasms in her lower cervical spine and upper thoracic spine and (2) cervical pain with associated numbness and tingling in her arms and fingers. (Tr. at 437). Upon examination, Dr. Collins found a decreased sensory nerve function in her right upper extremity and decreased motor nerve function in her left upper extremity. Dr. Collins also observed a decreased cervical range of motion with associated pain. Dr. Collins opined that Plaintiff could not do anything that required her to put her hands to her head, bend her back, or anything that would add weight to her head.

On September 27, 2005, Dr. Felty completed two questionnaires provided by Plaintiff's attorney, one entitled "lumbar spine residual functional capacity questionnaire" and another entitled "physical residual functional capacity questionnaire." (Tr. at 493-505; *see* Tr. at 629). Dr. Felty remarked that Plaintiff suffered from chronic lower back pain, chronic diarrhea with urgency, high blood pressure, and diabetes mellitus. (Tr. at 493, 499). Dr. Felty stated that Plaintiff's prognosis was poor and that he expected her impairments to last at least 12 months. (Tr. at 495, 500). He also

imposed a number of restrictions on Plaintiff's physical activity, including a marked limitation on her ability to sit, stand, and walk, among other limitations. (Tr. at 495, 501).

    **3.    Hearing Testimony**

A hearing was held before the ALJ on November 2, 2005. (Tr. at 591). Plaintiff appeared personally and was represented by an attorney. *Id*.

    *a.    Plaintiff's Testimony*

Plaintiff testified that she was born on February 22, 1946, and that she was 59 years old on the date of the hearing. (Tr. at 595). Plaintiff testified that she graduated from high school and that she had not worked since December 2003. (Tr. at 595-96). Prior to her alleged disability date of December 23, 2003, Plaintiff worked as a traveling salesperson for a variety of companies. (Tr. at 596-601). In her most recent position, she was a regional manager with an 18-state territory. (Tr. at 595). Her work as a traveling salesperson involved extensive travel and frequent lifting and carrying of luggage and briefcases weighing up to 50 pounds. (Tr. at 597-99).

Plaintiff testified that a deteriorating back condition led her to have spinal fusion surgery in December of 2003. (Tr. at 606-07). Since moving to Texas in June of 2004, she testified she had been under the care of Dr. Felty, a general practitioner, but did not see a medical specialist or a physical therapist for her back problems. (Tr. at 609-11). She testified that she had difficulty standing, sitting, and moving around; she further testified that the only relief she experienced is when she lay down. (Tr. at 611). She also testified that she had difficulty bending over and that her left leg occasionally gave out from under her. (Tr. at 612).

Plaintiff testified that on a typical day, she got up and made coffee, helped her grandchildren get ready for school, and made breakfast for herself and others in the household. (Tr. at 613). She testified that she spent most of the day lying down watching television and talking to friends on the

phone, but she also performed light housework and went to the grocery store. (Tr. at 613-15). When she grocery shopped, she testified, she had difficulty lifting things that weighed less than 10 pounds and required assistance loading and unloading groceries. (Tr. at 614). She believed that her difficulty in lifting things stemmed from her neck, shoulder, and back problems. (Tr. at 616), The only exercise she got was a daily walk around the block. (Tr. at 615).

Plaintiff also testified that she suffered from frequent, urgent incontinence that began after her lower back surgery. (Tr. at 617-18). She wore a diaper and took Imodium. (Tr. at 618). She also testified that she had been diagnosed with diabetes, carpal tunnel syndrome, a hiatal hernia, high blood pressure, arthritis and degeneration in her neck, cataracts, bursitis, sleep apnea, and depression. (Tr. at 620-23). Plaintiff took a number of medications for her numerous ailments and occasionally suffered from nausea and drowsiness as a result. (Tr. at 626-27).

### *b.    Vocational Expert Testimony*

The vocational expert ("VE") classified all of Plaintiff's past relevant work as a sales representative, a light, skilled position with an SVP of 5. (Tr. at 606). The VE further testified that the sales representative is generally performed in the economy as light work. *Id*.

The ALJ asked the VE whether someone who could not "bend over completely" would be able to perform the job of a salesperson at the light exertion level. (Tr. at 637). The VE testified that according to the Dictionary of Occupational Titles, someone with such a limitation would be able to work as a salesperson at the light exertion level. *Id*. The VE further testified that there would be no transferrable skills to sedentary work. *Id*.

**C.    ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on April 24, 2006. (Tr. at 12-21). The ALJ found that Plaintiff met the nondisability requirements for a period

of disability and was insured for disability benefits through the date of her decision. (Tr. at 16; 20, ¶1). The ALJ found that Plaintiff had not engaged in substantial gainful activity since December 23, 2003, the alleged date of disability onset. (Tr. at 16; 20, ¶2). The ALJ found that Plaintiff had the severe impairments of a disorder of the back and arthritis but that these impairments did not meet or equal one of the listed impairments. (Tr. at 17; 20, ¶¶3, 4).

The ALJ found that Plaintiff's subjective complaints and allegations of her limitations were not totally credible due to inconsistencies between her testimony and reports from her treating surgeon that she was doing well. (Tr. at 18; 20, ¶5). The ALJ also noted inconsistencies in the record between Plaintiff's daily activities, her level of activity since moving to Texas, and Dr. Bidiwala's notation that Plaintiff did not suffer from incontinence. (Tr. at 18-19).

The ALJ determined that Plaintiff retained the residual functional capacity to perform light work activity in that she could lift and carry 20 pounds occasionally, stand for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. (Tr. at 19; 20, ¶7). The ALJ concluded that Plaintiff's medically determinable impairments did not prevent her from performing her past relevant work as a sales representative. (Tr. at 19; 20, ¶¶8, 9). Accordingly, Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of her decision. (Tr. at 19; 20, ¶10).

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.   **Issues for Review**

Plaintiff presents the following issues for review:

(1)   The ALJ failed to consider and evaluate all impairments supported by the record;

(2)   The ALJ erred in finding that claimant's impairments were not of listing level severity;

(3)   The ALJ's credibility finding is not supported by substantial evidence;

(4)   The ALJ's RFC finding is not supported by substantial evidence; and

(5)   The ALJ erred in not finding Plaintiff disabled via application of the medical vocational guidelines.

(Mot. at 1).[5]

C.   **Issue One: Severe Impairment**

The first issue raised by Plaintiff is that the ALJ failed to consider and evaluate all medical impairments supported by the record. (Mot. at 11). In the instant case, the ALJ determined that Plaintiff's back disorder and arthritis were severe within the meaning of the regulations. (Tr. at 17, 20, ¶3). Plaintiff contends that the ALJ failed to include her neck impairment and incontinence as severe impairments.

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the

---

[5]Although Plaintiff also lists a sixth issue for review, that the ALJ erred in finding that she could perform her past relevant work, this issue is neither identified in the table of contents nor briefed in the substantive part of the motion. *See* Mot. at 1(issue E), 30-32 (addressing RFC and then the medical-vocational guidelines); *see* Mot at (i) (not including past relevant work as an itemized issue for review). To the extent Plaintiff intended to raise this issue, it was not briefed as expressly required by the scheduling order, and it is therefore deemed abandoned. (*See* docket #21, at 3).

regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

In this case, the ALJ explicitly stated that she evaluated all medically determinable impairments pursuant to the criteria set forth in *Stone* and 20 C.F.R. § 404.1520(b). (Tr. at 16; 20, ¶3). She therefore applied the correct legal standard for severity. *Stone*, 752 F.2d at 1106 (courts are to assume the application of an incorrect standard unless the ALJ references the *Stone* opinion or the Fifth Circuit's construction of relevant regulations); *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The question for the Court thus is whether substantial evidence supports the ALJ's decision to exclude Plaintiff's allegations of a neck impairment and incontinence at step 2. *See Greenspan*, 38 F.3d at 236.

With regards to Plaintiff's allegations of a neck impairment, three medical doctors noted some form of neck impairment during the relevant time period. In March of 2004, Dr. Lisa Barr observed that Plaintiff's cervical range of motion was well maintained but that she also had extensive muscle tension with active trigger points in several of the muscles in her upper back and neck. (Tr. at 352). Based upon this examination, Dr. Barr opined that Plaintiff had chronic cervicalgia and myofascial pain syndrome with muscle spasms. (Tr. at 353). Dr. Barr prescribed physical therapy, which Plaintiff underwent until her move to Texas in June of 2004. (Tr. at 353, 380-85). Drs. Wong and Gilbert, the radiologists who read Plaintiff's cervical spine MRI, noted that Plaintiff had moderate right uncovertebral joint hypertrophy at the C3-C4 and C6-C7 levels and that

the hypertrophy contributed to mild to moderate foraminal stenosis at these locations in Plaintiff's neck. (Tr. at 572). Although Dr. Bidiwala stated that Plaintiff's cervical spine MRI was "unremarkable," (Tr. at 569), this evaluation of the MRI contrasts with the findings of the radiologists who identified mild to moderate abnormalities in her neck. Based on the medical evidence from Drs. Barr, Wong, and Gilbert that suggests a limited ability to perform gainful activity, the Court finds a lack of substantial evidence to support the ALJ's decision that Plaintiff's neck impairment was not "severe" within the meaning of the Social Security regulations.[6] *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 236.

With regards to Plaintiff's allegation of urinary and fecal incontinence, incontinence may be an impairment for purposes of the Social Security Act and must be considered by the Commissioner in determining whether a claimant is disabled. *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999). Plaintiff's administrative record contains little (and conflicting) information about this alleged impairment. When Plaintiff visited Dr. Licker in early August of 2004 for blood in her urine, Dr. Licker noted that Plaintiff described a history of stress incontinence but that she did not demonstrate any stress incontinence at the time of her visit. (Tr. at 428). When she visited Dr. Bidiwala in September of 2004, he explicitly noted that she denied any bowel or bladder incontinence. (Tr. at 576). At the administrative hearing, however, Plaintiff disagreed with Dr. Bidiwala's entry and testified that she told him that she suffered from incontinence. (Tr. at 617). She also testified that she called his office regarding what she believed to be an error in her medical

---

[6]In addition to evidence for a neck impairment from three medical doctors, Plaintiff also presented evidence of a neck impairment and a restricted cervical range of motion from her physical therapist and two chiropractors. (*See* Tr. at 298-304, 383, 437). Neither physical therapists nor chiropractors are listed as acceptable medical sources who can provide evidence to establish an impairment at step 2 of the sequential evaluation process. 20 C.F.R. § 404.1513(d)(1). The ALJ, however, may consider evidence from these sources to assess the severity of an impairment and how it affects a claimant's ability to work. *Id*.

record. (Tr. at 617). It is not clear from the record whether Dr. Bidiwala responded. *See id.* Given the discrepancies in the administrative record, the ALJ should have recontacted Plaintiff's treating physicians as required by the Social Security regulations to resolve the conflict over Plaintiff's alleged incontinence. 20 C.F.R. § 404.1512(e)(1). Since the record is inadequately developed on this point, the Court finds a lack of substantial evidence to support the ALJ's decision not to include incontinence as a "severe" impairment in accordance with the Fifth Circuit's interpretation.[7] *Legget*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 236; *Stone*, 752 F.2d at 1101.

Defendant raises a number of objections to Plaintiff's allegations of error at step 2. Defendant first contends that Plaintiff has not demonstrated any resulting harm from the ALJ's failure to follow a particular rule. (Resp. at 5) (citing *Shave v. Apfel*, 238 F.3d 873, 875 (5th Cir. 2001). This objection is inapplicable to the instant issue for review because the ALJ did not commit legal error at step 2; rather, she did not support her step 2 determination with substantial evidence. Defendant also contends that Plaintiff's neck abnormalities do not automatically provide a basis for substantive functional limitations. (Br. at 7). While this statement is true, step 2 only requires a severe impairment to be more than a slight abnormality with a minimal effect on a claimant's ability to work. *Stone*, 752 F.2d at 1101. Defendant next raises a series of arguments about how the medical evidence in the record does not support the alleged functional limitations. (Resp. at 11-15). Given that Plaintiff presented some evidence about how her alleged neck impairment and

---

[7]The Court notes that the administrative record contains two documents from Dr. Felty in support of Plaintiff's allegations of incontinence. The first is the attorney-provided "physical residual functional capacity questionnaire" that diagnoses Plaintiff with chronic diarrhea. (Tr. at 499). The Fifth Circuit has not addressed the issue of checklists of functional capacity supplied by claimants' counsel, but other courts have found such checklists to be conclusory and not entitled to controlling weight. *Santiago-Rivera v. Barnhart*, 2006 WL 2794189, *9 (E.D. Pa. Sept. 26, 2006) (treating physician's opinion, as expressed in an attorney-provided checklist assessment, was not reasonably supported by the objective medical evidence in the record); *Mann v. Barnhart*, 2005 WL 1995447, *5 (W.D. Va. Aug. 18, 2005) (treating physician's checklist opinion does not merit more than minimal weight). The second document from Dr. Felty is a letter dated July 8, 2006, that states Plaintiff has chronic diarrhea. (Tr. at 582). This letter post-dates the administrative hearing and was not considered by the ALJ.

incontinence were more than slight abnormalities that had more than a minimal effect on her ability to perform gainful activity, these objections by Defendant are more appropriately raised in regards to Plaintiff's RFC, which the ALJ assesses before proceeding from step three to step four of the sequential analysis. 20 C.F.R. § 404.1520(a)(4). The Court cannot speculate how the workplace might accommodate Plaintiff's severe impairments; it can only scrutinize the record for substantial evidence and determine whether the Commissioner applied proper legal standards. *Greenspan*, 38 F.3d at 236.

In sum, the Court finds a lack of substantial evidence to support the ALJ's decision to exclude Plaintiff's allegations of a neck impairment and incontinence from the step 2 determination of severe impairments. For this reason, the case must be remanded for further consideration. Because the ALJ erred at an early stage of the proceedings, and the step 2 errors necessarily impact the three remaining steps of the sequential disability determination process, the Court does not consider Plaintiff's remaining issues concerning those three steps.

### III. RECOMMENDATION

For the foregoing reasons, the Court recommends that *Plaintiff, Hedwig March's, Motion and Incorporated Brief in Support of Summary Judgment* be **GRANTED** and *Commissioner's Motion for Summary Judgment* be **DENIED**. The Court recommends that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further administrative proceedings.

**SO RECOMMENDED**, on this 10th day of May, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE